# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 27 2017, 6:15 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Julianne L. Fox
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

C.D. (Minor Child)

And

M.D. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

March 27, 2017

Court of Appeals Case No.
82A05-1610-JT-2458

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Renee A. Ferguson, Magistrate

Trial Court Cause No.
82D04-1604-JT-647



*Appellee-Petitioner*

**Altice, Judge.**

## Case Summary

M.D. (Mother) appeals following the involuntary termination of her parental rights to C.D. (Child). On appeal, she challenges the sufficiency of the evidence supporting termination.

We affirm.

## Facts & Procedural History

Mother gave birth to Child on May 26, 2014. On or about June 6, 2014, the Indiana Department of Child Services (DCS) became involved with Mother after receiving a report that Child had tested positive for THC at birth. Child also tested positive for methadone. At that time, Mother admitted she had an opiate addiction and that she had been prescribed methadone as part of her treatment through the Evansville Treatment Center. Mother had been treated with methadone during her entire pregnancy.

[4]     Hilary Bemis, a Family Case Manager with DCS (FCM Bemis), was unable to get in touch with Mother from June 10, 2014 to June 26, 2014. On June 27, 2014, Mother tested positive for methamphetamine. Child was removed from Mother's care and placed with his maternal grandparents (Grandparents). On July 14, 2014, DCS filed its child in need of services (CHINS) petition alleging, among other things, that Child's meconium screen was positive for THC and that Mother tested positive for methamphetamine. On September 16, 2014, Mother stipulated to the CHINS allegations and the court adjudicated Child a CHINS. The parental participation plan required Mother to obtain a substance-abuse evaluation and follow any treatment recommendations, submit to random drug screens, and participate in supervised visitation with Child.

[5]     According to FCM Bemis, Mother initially cooperated with DCS and had negative drug screens. Mother's participation in services was going so well that DCS arranged for a trial home visit in October 2014. At that time, Mother resided in Grandparents' home where Child had been placed. In December 2014, Mother was evaluated and provided services for substance abuse and kleptomania through Counseling for Change. In February 2015, Mother was arrested for theft. Child was removed from Mother's care and again placed with Grandparents. A week later, DCS gave Mother another chance by returning Child to her care.

[6]     FCM Bemis noted that from February to mid-April 2015, Mother was doing "fairly well." *Transcript* at 12. Mother and Child continued to live with Grandparents. In April, Mother became less compliant with services in that she

was missing drug screens and leaving with Child for days at a time without informing DCS or Grandparents as to her whereabouts. Conflict between Mother and Grandparents led to arguments in front of Child. One such argument escalated to the point where Mother engaged in a physical altercation with her mother, who was holding Child at the time. Around this same time, there was an incident where someone reported that Mother was in public under the influence while Child was in her care. Based on the report, police were dispatched to look for Mother and Child. When Mother and Child eventually returned to Grandparents' home, Mother was impaired.

[7]     On May 4, 2015, Grandparents informed DCS that they were no longer comfortable with Mother staying in their home. DCS again removed Child from Mother's care and placed him with Grandparents and required that Mother move out of Grandparents' home. Three days later, Mother refused to comply with a DCS order that she submit to a hair screen. Over the next couple of weeks, Mother consistently visited Child. By mid-June, however, Mother stopped visiting Child altogether. Soon thereafter, DCS stopped providing visitation services.

[8]     When Mother was not living with Grandparents, she was living with her boyfriend and helping to care for his father. On June 18, 2015, Mother went to an emergency intervention location and reported that she had fled from her boyfriend because he was "beating her and locking her in the basement and giving her drugs." *Id.* at 15. A police officer interacted with Mother and noted that she appeared to be under the influence in that she was slurring her words

and was very incoherent. The violent history between Mother and her boyfriend is supported by the multiple police runs to the home in response to reports of domestic disputes and drug use. DCS offered Mother domestic violence services or "any help at that point," but Mother refused. *Id.*

[9] In August 2015, Mother was involuntarily committed to the Western State Hospital in Kentucky because she was suffering from a drug-induced psychosis. A hearing to modify the dispositional decree was held in September 2015. At that hearing, Mother appeared to be impaired—"she was slurring her words, could not form complete sentences and walked off after spilling the contents of her purse on the floor from her lap, seemingly oblivious to the situation." *Appellant's Appendix* at 5. Mother was again ordered to submit to a hair screen, but she refused.

[10] In mid-September, Mother was arrested on two separate occasions—one for resisting law enforcement and one for failure to appear. Mother remained in the Vanderburgh County jail from September 23, 2015 until December 20, 2015. Mother contacted FCM Bemis upon her release, and FCM Bemis set up drug screens for Mother. Mother did not comply with the drug screens and all contact between DCS and Mother ceased shortly thereafter. Mother was arrested again in February 2016 on a petition to revoke her probation in a criminal case out of Posey County. Mother remained incarcerated until May 28, 2016. While incarcerated, FCM Bemis met with Mother on two occasions and both times Mother admitted that she could not take care of Child. In June 2016, after her release, Mother voluntarily checked herself into another

residential treatment program that was to last anywhere from nine months to two years. Mother has not seen Child since June 2015.

[11] On April 18, 2016, while Mother was incarcerated, DCS filed a petition to terminate her parental rights. The court held a fact-finding hearing on July 20, 2016. On September 27, 2016, the court entered its order terminating Mother's parental rights. Mother now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[12] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[13] The trial court entered findings in its order terminating parental rights. When the court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record

contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id*.

[14] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

[15] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the wellbeing of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and there is a satisfactory plan for the child's care and treatment. I.C. § 31-35-2-4(b)(2)(C), (D).

[16] Mother argues that the evidence did not establish that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied. In making this determination, "the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against 'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013)). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[17]   In its order terminating Mother's parental rights, the trial court made the
following findings:

> 45.  Despite [Mother's] recent efforts at substance abuse
> treatment it is unlikely that [she] will be successful in resolving
> her substance abuse issues.
>
> 46.  [Mother] has not been compliant with the orders of the
> CHINS court or the criminal courts.  [Mother] has utterly failed
> to comply with random drug screens.
>
> 47.  [Mother] has not seen her child, other than some phone calls
> after she was recently released from jail, since June of 2015.
>
> 48.  The criminal court as well as the CHINS court has
> repeatedly given [Mother] opportunities to remedy her substance
> abuse and criminal issues.  [Mother] will accept treatment at
> times when she is in trouble.  But despite entering treatment, over
> and over again, [Mother's] substance abuse and criminal issues
> continue.
>
> 49.  [Mother] has shown a long term pattern of continued
> substance abuse and failed treatment.
>
> 50.  [Mother's] long term and unresolved substance abuse issues
> have repeatedly placed her in dangerous situations and have
> severely impacted her ability to provide a safe stable and secure
> environment for the Child.

*Appellant's Appendix* at 6-7.

[18]   Mother does not challenge any of the court's findings.  Rather, Mother urges us
to consider that after she was released from incarceration, she voluntarily

sought treatment at a residential treatment facility.  Mother also notes that she has cut ties with the boyfriend that caused concerns for her caseworker and emphasizes that in the past, she was able to hold steady employment.  Mother describes herself as "stable and clean" at the time of the termination hearing. *Appellant's Brief* at 9.

[19]   Contrary to Mother's argument, her status at the time of the termination hearing is not the only relevant inquiry.  As noted above, a court must balance a parent's recent improvements against "habitual pattern[s] of conduct" in deciding whether there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied.  *E.M.*, 4 N.E.3d at 643. Here, the trial court's undisputed findings are amply supported by the record and demonstrate that Mother has a history of substance abuse and criminal activity and that prior attempts to address her substance abuse and kleptomania have proven unsuccessful.  Mother's argument that her status at the time of the termination hearing should be afforded more weight than her history of failed attempts to get her life under control is simply a request that this court reweigh the evidence, a task that we will not undertake on appeal.  Mother has not established that the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied is clearly erroneous.

[20]   Mother also challenges the court's conclusion that termination and the permanency plan are in Child's best interests.  Mother first asserts that because the permanency plan is for her sister to adopt Child, it is likely that she will

continue to have some kind of relationship with Child. In such case, Mother argues that delaying termination until she completes her inpatient treatment would not harm or disadvantage Child. In other words, Mother asserts that Child's best interests would be served through a guardianship until she completes her substance-abuse treatment.

The court made the following findings concerning Mother's request in this regard:

> 51. [Mother] urges the court to consider a guardianship rather than a termination, but the extent of [Mother's] substance abuse and criminal issues along with the fighting that goes on between [Mother] and the family weighs strongly against a guardianship.
>
> 52. [FCM Bemis], and the Court Appointed Special Advocate ("CASA") testified that it is in [Child's] best interest that [Mother's] parental right be terminated.
>
> 53. [FCM] Bemis and CASA also recommended that the permanency plan of adoption was the best permanency plan for [Child].

*Appellant's Appendix* at 7.

Even given Mother's current status, FCM Bemis and the CASA testified that termination was in Child's best interests in light of Mother's history. The court's findings demonstrate that the court ultimately agreed with FCM Bemis and the CASA that termination was in Child's best interests. *See In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) ("the recommendations of the case

manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests"). We will not second-guess the court's determination.

[23] Moreover, we note that there was evidence that Child has visited with and bonded with his aunt and uncle and that his aunt and uncle can provide an appropriate home for Child. Mother, on the other hand, has been in and out of jail and absent for much of Child's young life.

[24] In sum, the court's findings of fact are supported by the evidence in the record and the court's conclusions supporting termination of Mother's parental rights are not clearly erroneous.

[25] Judgment affirmed.

[26] Kirsch, J. and Mathias, J., concur.